Kerry L. THOMAS, Plaintiff,

v.

CITY OF GALVESTON, TEXAS, et al., Defendants.

Civil Action No. H–10–3331.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 1, 2011.

Robert D. Kinsey, Jr., Kinsey Ridenour et al., Ryan P. Sullivan, Kinsey Rowe Becker Kistler LLP, Lincoln, NE, for Plaintiff.

William Scott Helfand, Norman Ray Giles, Chamberlain Hrdlicka et al., Houston, TX, for Defendants.

## MEMORANDUM AND ORDER

KEITH P. ELLISON, District Judge.

Pending before the Court is Defendants' Motion to Dismiss for Failure to State a Claim (Doc. No. 6). After considering the parties' arguments and the applicable law, the Court grants the motion in part and denies it in part.

## I. BACKGROUND [1]

This case arises from events that occurred in Galveston, Texas in the aftermath of Hurricane Ike ("the hurricane") in September 2008. Plaintiff Kerry L. Thomas and his wife Lisa Weinberger (collectively, the "Thomases") were residents of Galveston at the time. They chose not to evacuate for the hurricane because their home had been vandalized and looted after they evacuated for Hurricane Rita in 2005.

On September 18, 2008, five days after the hurricane struck Galveston, Weinberger purchased a 15,000 KW generator at Home Depot to power Plaintiff's and her home and to supply power for the

---

1. Except as noted, these facts are taken from Plaintiff's First Amended Complaint (Doc. No. 4) and are assumed to be true for purposes of the Motion to Dismiss. *See Johnson v. Johnson,* 385 F.3d 503, 529 (5th Cir.2004).

neighbors. The generator was loaded onto a flat-bed trailer that was pulled by Plaintiff's truck. Weinberger parked the truck and trailer on the street in front of their home and did not unload the generator that day. Plaintiff and Weinberger went to bed around 8:00 p.m. because of the curfew in effect in Galveston.

At approximately 10:00 p.m. that evening, the Thomases were awoken by the barking of their dogs. The Thomases looked out the front window and observed what appeared to be flashlights being shined on and around the generator. Plaintiff went to the front door, and through the nearby window observed at least two individuals with flashlights moving around the trailer where the generator was stored. Those individuals were later identified as Defendant Joseph P. Atchley ("Officer Atchley") and Defendant Joshua Alfred ("Officer Alfred") (collectively, "the officers"). Through the window, Plaintiff several times loudly requested that the individuals identify themselves, but the individuals did not respond, and remained standing near the generator.

Plaintiff then located his Ruger 225 rifle (which he had with him near the front door) and opened the front door. Then, while standing in the doorway holding his rifle "at port arms" with the safety on, Plaintiff stated something to the effect of "identify yourself or you will be fired upon." The flashlights then pointed directly into Plaintiff's eyes, and Plaintiff heard a man's voice say, "Galveston Police, throw down your gun." Plaintiff slowly bent down and put his rifle on the porch and put his hands in the air with his palms forward. He states that, as a weapons trained veteran, he knew better than to

throw down his rifle, which could result in an accidental discharge of ammunition.

Officers Atchley and Allred then rushed towards Plaintiff. One officer grabbed Plaintiff and threw him forward from the porch, down five steps. Plaintiff landed face down on the concrete sidewalk, and witnesses heard him scream in pain. The officers immediately and aggressively placed Plaintiff in handcuffs, excessively tight on his wrists. Plaintiff did not resist.

While Plaintiff was handcuffed face-down on the ground, the officers began to kick him in the shoulders, back, and head. One of the officers kicked Plaintiff squarely in the front part of his head, at which point Plaintiff felt a sharp pain inside his head and began to lose consciousness. One of the officers then grabbed the chain of the handcuffs and picked Plaintiff up from the ground, lifting the weight of Plaintiff's body by the handcuffs alone. Plaintiff screamed in pain as the handcuffs tore into his wrists, breaking the skin and causing severe damage to the wrist joint. Plaintiff then lost consciousness. Weinberger begged the officers not to take Plaintiff away because she did not want to be left alone in the lawless post-hurricane environment in Galveston. One officer[2] responded, "It's your own fault for not evacuating, you deserve what you get," and another stated, "Martial law, you know."

Plaintiff was arrested, taken to Galveston County Jail, and charged with aggravated assault against a public servant. He regained consciousness in jail, and awoke bloody and in severe pain. Due to outages caused by the hurricane, there was no hot water and no toilet facility in the county jail. Plaintiff was offered no immediate medical attention and had no access to a

---

**2.** By this point, other unidentified officers had arrived on the scene, in addition to Officers Atchley and Allred.

telephone in order to contact his wife or a bondsman. While in jail, he was unable to sleep due to the severe pain, the injuries to his head, and the thought of his wife home alone without any news from him. Plaintiff felt alone, hopeless, and powerless.

On September 20, 2008, Plaintiff was seen by a nurse at the jail—the first and only medical attention he received—and the nurse was unable to provide any medication or treatment for his injuries. That day, Weinberger posted Plaintiff's bail of $40,000, and Plaintiff was released. On October 3, a bond hearing was held, and Plaintiff's bond was increased to $100,000, although no reason for the increase was ever provided to Plaintiff. Plaintiff immediately turned himself in and posted the second bond. On October 5, 2009, the Galveston County Chief Prosecutor filed a motion to dismiss all charges against Plaintiff, in the interest of justice. Judge Susan Criss dismissed all charges.

Plaintiff brings this action for several violations of the U.S. Constitution pursuant to 42 U.S.C. § 1983 ("Section 1983"). He alleges that that he was falsely arrested and subjected to excessive force in violation of the Fourth Amendment, deprived of due process, retaliated against for exercising his Second Amendment Rights, and denied adequate medical treatment in violation of the Fourteenth Amendment. He brings these claims against Officers Atchley and Allred in their individual and official capacities, and against the City of Galveston pursuant to *Monell v. Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).[3]

## II. LEGAL STANDARD FOR MOTIONS TO DISMISS

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need de-

tailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (citation omitted).

Ultimately, the question for the court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 129 S.Ct. at 1950 (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). The court should not "'strain to find inferences favorable to the plain-

---

**3.** Plaintiff also alleged, but has agreed to withdraw, claims under the Eighth Amendment and Texas state law as well as claims against the Galveston Police Department. Accordingly, those claims are dismissed.

tiffs' " or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.' " *R2 Investments LDC v. Phillips,* 401 F.3d 638, 642 (5th Cir.2005) (citation omitted). Importantly, the court should not evaluate the merits of the allegation, but must satisfy itself only that plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 376 (5th Cir.2004). "Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 231 (5th Cir. 2009) (internal citation omitted).

■ Officials sued in their individual capacities are protected by qualified immunity unless the act violates a constitutional right clearly established at the time. *Sanchez v. Swyden,* 139 F.3d 464, 466–467 (5th Cir.1998). "The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions." *Cozzo v. Tangipahoa Parish Council,* 279 F.3d 273, 284 (5th Cir.2002). To determine whether the plaintiff has overcome the presumption of qualified immunity, the Court first considers whether the plaintiff has proven a violation of a clearly established constitutional right. *Collins v. Ainsworth,* 382 F.3d 529, 537 (5th Cir.2004). A right is "clearly established" if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). If that prong is met, the court must consider whether the defendant's "actions were objectively reasonable" in light of "law which was clearly established at the time of the disputed action." *Collins,* 382 F.3d at 537. "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Glenn v. City of Tyler,* 242 F.3d 307, 312 (5th Cir. 2001). "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated" the plaintiff's asserted constitutional or federal statutory right. *Thompson v. Upshur County,* 245 F.3d 447, 457 (5th Cir.2001).

## III. OFFICIAL CAPACITY CLAIMS

■ Defendants move to dismiss the claims against Officers Atchley and Allred in their official capacities on the grounds that they are duplicative of the claims against the city. "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell v. Dep't of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "Suits against state officials in their official capacity therefore should be treated as suits against the State." *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). The Fifth Circuit has held that it is appropriate to dismiss claims against officers in their official capacities when the "allegations duplicate claims against the respective governmental entities themselves." *Castro Romero v. Becken,* 256 F.3d 349, 355 (5th Cir.2001). Plaintiff argues that the official-capacity claims in this case should not be dismissed because they rely on different theories of liability than the claims against Galveston. *See Abdeljalil v. City of Fort Worth,* 189 F.3d 466, 1999 WL 511355, at *1 and n. 2 (5th Cir. June 22, 1999) (unpublished) (holding that dismissal as "duplicative" was inappropriate because official-capacity claims were based on dif-

ferent theory of liability than claims against city).

■ The Court finds that the official-capacity claims against the officers must be dismissed. The Supreme Court noted in *Graham* that "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, . . . local government units can be sued directly." 473 U.S. at 167 n. 14, 105 S.Ct. 3099. Plaintiff argues that the official-capacity claims against the officers are based on theories of liability "involving Fourth and Fourteenth Amendment violations involving unlawful seizure, excessive force, and violations of due process." (Doc. No. 21, at 7.) However, to the extent that those claims are not actionable against the city because there is no *respondeat superior* liability for municipalities, they are also barred as official-capacity claims. *See Graham*, 473 U.S. at 166, 105 S.Ct. 3099 ("in an official-capacity suit the [municipal] entity's 'policy or custom' must have played a part in the violation of federal law"). A suit against a municipal official in his official capacity is no different from a suit against the municipality itself, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), so a plaintiff cannot somehow expand the scope of municipal liability by labeling them as official-capacity suits.[4]

Accordingly, Defendants' Motion to Dismiss is granted with respect to the official-capacity claims.

## IV. FOURTH AMENDMENT CLAIMS

### A. Excessive Force

■ The Fourth Amendment to the U.S. Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The excessive use of force by a law-enforcement officer on an individual "in the context of an arrest or investigatory stop" constitutes an "unreasonable seizure" of the individual, in violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

■ "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must establish: (1) an injury; (2) that the injury resulted directly from the use of excessive force; and (3) that the excessiveness of the force was unreasonable." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir.2007)).

In this case, Plaintiff alleges that one of the officers grabbed Plaintiff and threw him off of the porch, down five steps on to the concrete sidewalk, where he landed on his face and screamed in pain. Plaintiff also alleges that, although he did not literally comply with the order to "throw" his rifle down, he did slowly bend down and put the rifle on the porch, and put his hands in the air with his palms forward. Plaintiff then alleges that, after he was handcuffed and face-down on the ground, the officers kicked him in the shoulders, back, and head to the point that he began to lose consciousness. He alleges that one of the officers picked Plaintiff up by the

---

4. Of course, Plaintiff may bring claims on those theories against the officer in their *individual* capacities, as individual-capacity suits are distinct from suits against the municipality. *See Hafer*, 502 U.S. at 25, 112 S.Ct. 358.

handcuffs alone, causing the handcuffs to tear into Plaintiff's wrists, break his skin, cause severe damage to his wrist joint.

At oral argument, Defendants' counsel conceded that Plaintiff has alleged excessive force in the arrest sufficiently at this stage of the case. Accordingly, Defendants' Motion to Dismiss is denied with respect to this claim.

## B. False Arrest

■■■ "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford,* 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Levine,* 80 F.3d 129, 132 (5th Cir.1996). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Fields v. City of South Houston,* 922 F.2d 1183, 1189 (5th Cir.1991) (quoting *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)); *see also Levine,* 80 F.3d at 132 ("The presence of probable cause is a mixed question of fact and law."). "[I]f a reasonable officer could have concluded that there was probable cause upon the facts then available to him, qualified immunity will apply." *Brown v. Lyford,* 243 F.3d 185, 190 (5th Cir.2001).

■■■ Plaintiff argues that the officers lacked probable cause that Plaintiff had committed any crime, and arrested him merely so they could avoid liability themselves for having attempted to steal Plaintiff's generator. Defendants argue that the officers had probable cause to believe that Plaintiff had violated two laws. First, they argue that Plaintiff violated the emergency curfew law.[5] The law in effect in Galveston at the time of Plaintiff's arrest provided, in relevant part, "It shall be unlawful for any person, without proper authority, to be upon the public streets or rights-of-way located within the City of Galveston between the hours of 6:00 P.M. and 6:00 A.M. the next morning...." (Doc. No. 29–1, at 4.) In the complaint, Plaintiff alleges that he was in his doorway and on his porch until he was thrown off of the porch by one of the defendants. Accepting these allegations as true, no reasonable officer could have concluded that Plaintiff was "upon the public streets or rights-of-way" in violation of the curfew law. Thus, Plaintiff has sufficiently alleged that the officers lacked probable cause to arrest him for violation of that law.

■■■ Second, in their reply brief, Defendants contend that there was probable cause to believe that Plaintiff had committed a "terroristic threat" in violation of Section 22.07(a)(2) of the Texas Penal Code, which prohibits "threaten[ing] to commit any offense involving violence to any person or property with intent to ... place any person in fear of imminent serious bodily injury." Plaintiff acknowledges that, "[s]tanding alone, Plaintiff's words may have satisfied the bare elements for a Terroristic Threat." (Doc. No. 34, at 1.) Plaintiff contends, however, that because the threat was made in defense of property, there was no probable cause to believe that Plaintiff had committed the criminal act of a terroristic threat. Under Texas law, a threat of force in defense of proper-

5. The parties did not provide the Court with the text of the curfew law with their initial briefing, but Defendants did submit it in advance of oral argument.

ty is a defense to prosecution. *See* Tex. Penal Code §§ 9.02 ("It is a defense to prosecution that the conduct in question is justified under this chapter."), 9.41 ("A person in lawful possession of land or tangible, movable property is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property."), 9.42 (describing circumstances in which use of deadly force to protect property is justified); 9.04 ("The threat of force is justified when the use of force is justified by this chapter.").

The Fifth Circuit has explicitly declined to decide the issue of whether there are circumstances in which evidence supporting an affirmative defense is relevant to the probable cause inquiry. *See United States v. Craig,* 381 Fed.Appx. 459, 461 (5th Cir.2010) (unpublished) ("The parties disagree as to whether an arresting officer making a probable cause determination must consider facts establishing an affirmative defense. We need not resolve this dispute."); *Piazza v. Mayne,* 217 F.3d 239, 246–47 (5th Cir.2000) (declining to decide "whether, as a general principle, facts supporting the existence of an affirmative defense are relevant to the determination of probable cause," and "declin[ing] to adopt the district court's broad holding on that issue")[6]. At the Court's invitation, the parties submitted supplemental briefing on this issue.

All other circuits to consider the issue appear to have held that evidence of an affirmative defense is relevant to the probable cause inquiry in some circumstances. *Hodgkins ex rel. Hodgkins v. Peterson,* 355 F.3d 1048, 1061 (7th Cir.2004) ("A police officer may not ignore conclusively established evidence of the existence of an affirmative defense...."); *Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir.2003) ("We believe that under some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause."); *Estate of Dietrich v. Burrows,* 167 F.3d 1007, 1012 (6th Cir.1999) ("the officers in this case had full knowledge of facts and circumstances that conclusively established, at the time of the [plaintiffs'] arrests, that the plaintiffs were justified— by statute—in carrying concealed weapons during their work. Consequently, none of the defendants had probable cause at the time of the arrests to believe the plaintiffs had violated, were violating, or were about to violate the law."); *Radich v. Goode,* 886 F.2d 1391, 1396 (3d Cir.1989) ("appellants must not only show facts which support the defense, but also that a reasonable police officer would know of these facts and conclude that a defiant trespass had not been committed"; assuming *arguendo* that "to establish probable cause for arrest under Pennsylvania's defiant trespass statute the arresting officer must consider the statute's affirmative defense."); *Williams v. Sirmons,* 307 Fed.Appx. 354, 359 (11th Cir.2009) (unpublished) ("We are persuaded by *Dietrich* and agree that in determining whether probable cause to arrest exists, an officer must consider all facts and circumstances within that officer's knowledge, including facts and circumstances conclusively establishing an affirmative defense."); *see also Harris v. Roderick,* 126 F.3d 1189, 1198 (9th Cir.1997) (denying qualified immunity because officers could not "reasonably believe there was probable cause to arrest" where they allegedly falsely told other officers that suspect had not acted in self-defense). However, several of those courts have also made clear

---

6. The district court's "broad holding" was that "affirmative defenses do not bear on the probable cause analysis." *Piazza v. Mayne,* 23 F.Supp.2d 658, 662 (E.D.La.1998).

that officers are *not* required to conduct any investigation of whether affirmative defenses apply. As the Seventh Circuit summarized the law, "A police officer may not ignore conclusively established evidence of the existence of an affirmative defense, but the officer has no duty to investigate the validity of any defense." *Hodgkins*, 355 F.3d at 1061 (citations omitted); *see also Jocks*, 316 F.3d at 135–36 (distinguishing *Ricciuti v. N.Y. City Transit Auth.*, 124 F.3d 123 (2d Cir.1997)); *Painter v. Robertson*, 185 F.3d 557, 571 n. 21 (6th Cir.1999); *Williams*, 307 Fed. Appx. at 358.

Defendants do not point to any case holding that there are no circumstances in which evidence of an affirmative defense is relevant to the probable cause inquiry. For example, in *Finigan v. Marshall*, 574 F.3d 57 (2d Cir.2009), the Second Circuit held only that, once an officer possesses facts sufficient to establish probable cause, he need not weigh the evidence or negate any defense before an arrest. *Id.* at 63 (quoting *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir.1989)). This is in line with the distinction, discussed above, between considering facts actually known by the officer (which officers must do) and investigating all potential defenses (which they need not do).[7]

 The Court agrees with the other circuits that, "under certain circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause." *Jocks*, 316 F.3d at 135. At a minimum, if the arresting officer knows of facts that conclusively establish that an affirmative defense applies, it cannot accurately be said that the officer has probable cause that the suspect committed the offense. This is grounded in the purpose of the objective probable cause inquiry, which seeks to give force to the Fourth Amendment's protections without encroaching on police officers' broad discretion to exercise judgment in deciding whom to arrest. The probable cause inquiry looks at the "totality of facts and circumstances within a police officer's knowledge at the moment of arrest." *United States v. Wadley*, 59 F.3d 510, 512 (5th Cir.1995). A "corollary" of that rule is that officers "may not disregard facts tending to dissipate probable cause." *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir.1988). As other courts have held, this does not require an officer to affirmatively investigate potential defenses, but it prohibits him from ignoring knowledge that he already possesses relating to defenses. The Fourth Amendment does not permit police officers to arrest individuals whom they know have done nothing wrong, based solely on the formalistic distinction between "elements of a crime" and "affirmative defenses."

---

7. Defendants also cite two Seventh Circuit cases suggesting that affirmative defenses are not relevant to the probable cause inquiry. *Humphrey v. Staszak*, 148 F.3d 719, 724–25 (7th Cir.1998) ("There is no legal basis for allowing an affirmative defense, which might have allowed the plaintiff to escape a conviction for disorderly conduct, to interfere with the established § 1983 probable-cause-to-arrest analysis."); *Simmons v. Pryor*, 26 F.3d 650, 654 (7th Cir.1994) (noting in context of probable cause that "[t]he absence of legal justification is not an element of the offense, but rather is an affirmative defense to be raised by the defendant"). However, neither of those cases specifically addressed whether probable cause would be negated if an officer was aware of facts that conclusively established an affirmative defense. To the extent that the cases do suggest a bright-line rule, they are in tension with the later-in-time and more explicit statement in *Hodgkins* that "A police officer may not ignore conclusively established evidence of the existence of an affirmative defense, but the officer has no duty to investigate the validity of any defense." 355 F.3d at 1061.

For example, in *Jocks*, the plaintiff had an emergency and attempted to use a pay phone that was being used by an off-duty police officer, Tavernier, who was sitting in his van. 316 F.3d 128. Jocks testified that he informed Tavernier several times that it was an emergency, but that the officer refused and swore at him. *Id.* at 132. Then, Jocks testified:

> Jocks disconnected [Tavernier's] call by pressing down the hook of the telephone. Tavernier then threw the receiver at Jocks. Tavernier attempted to get out of his vehicle, but he was unable because the phone stand blocked the door. Tavernier drove the car forward 15 to 20 feet. Jocks began dialing 911 when Tavernier charged him and screamed at him, "[I]f I can't use the phone—you can't use the phone." Tavernier pushed Jocks out of the way and hung up the phone. Jocks and Tavernier yelled at each other briefly, and Jocks reiterated that the situation was an emergency. Tavernier then said, "[W]hy don't I blow your fucking brains out," and drew his service pistol. Jocks threw the phone handset back at Tavernier, striking him in the mouth, and ran towards the gas station. Tavernier ran him down, said "freeze, police," and pressed the gun into the back of Jocks's head as he walked him into the gas station.

*Id.* Shortly thereafter, "a uniformed police officer arrested Jocks based on Tavernier's account of the events." *Id.* at 133. The Second Circuit held that "a reasonable jury could have concluded that Tavernier should have known that Jocks was acting in self-defense" and "could therefore find that the arrest lacked probable cause."[8] *Id.* at 136.

In this case, Plaintiff has alleged that the officers were lurking outside of his house attempting to steal his generator; that Plaintiff only came out of his house after hearing his dogs barking, seeing flashlights, and seeing at least two individuals moving near the generator; and that prior to making any threat Plaintiff loudly requested several times that the individuals identify themselves. As in *Jocks*, Plaintiff's actions were allegedly provoked entirely by the conduct of the officers, so the officers would have known that Plaintiff only made a threat of force in defense of his property and had those done nothing wrong. "[I]n assessing probable cause to effect an arrest," they could not "ignore information known to [the]m which proves that the suspect is protected by an affirmative legal justification for his suspected criminal actions." *Painter*, 185 F.3d at 571. Accordingly, Plaintiff has sufficiently alleged that the officers lacked probable cause to arrest him.

 Defendants' argument for qualified immunity also fails. First, "[t]he right to be free from arrest without probable cause is a clearly established constitutional right." *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir.1994) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)); *see also Dietrich*, 167 F.3d at 1012 (denying qualified immunity because it was clearly established "that probable cause determinations involve an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest*," and those facts demonstrated that affirmative defense applied) (emphasis in original). Second, the arrest was not "ob-

---

8. The court rejected *Jocks's* claim that his actions were justified as "emergency measures" and thus defeated probable cause, because, although Jocks claimed there was an emergency, "Tavernier was neither compelled to accept these assertions at face value nor to investigate them." *Id.* at 136.

jectively reasonable." Taking the allegations to be true, no reasonable officer could have concluded that there was probable cause, because it would have been clear that Plaintiff only made a threat in defense of his property from the officers. *See Deville v. Marcantel,* 567 F.3d 156, 166 (5th Cir.2009) ("An officer's conduct is objectively reasonable if a reasonable person in their position could have believed he had probable cause to arrest.") (internal quotation marks omitted). Accordingly, Defendants' Motion to Dismiss is denied with respect to this claim.

## V. FOURTEENTH AMENDMENT CLAIMS

The Fourteenth Amendment provides, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Plaintiff alleges that Defendants violated his Fourteenth Amendment rights in several ways.

### A. False Charges

First, Plaintiff argues that the officers violated his due process rights by filing false police reports and submitted an affidavit containing false information, which led to Plaintiff being charged with a crime. Plaintiff further contends that they did so in order to protect themselves from prosecutions for attempting to steal Plaintiff's generator.

"[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *County of Sacramento v. Lewis,* 523 U.S. 833, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). The Fifth Circuit has held that "a police

officer's knowing efforts to secure a false identification by fabricating evidence or otherwise unlawfully influencing witnesses is not entitled to qualified immunity." *Good v. Curtis,* 601 F.3d 393, 398 (5th Cir.2010); *see also Devereaux v. Abbey,* 263 F.3d 1070, 1075 (9th Cir.2001) (en banc) ("[W]e are persuaded that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government.") (quoted in *Good,* 601 F.3d at 398–99).

Nowhere in his Amended Complaint does Plaintiff mention false police reports or false affidavits, or make any other reference to Officers Atchley and Allred taking improper actions so that Plaintiff would be charged with a crime. The closest thing to such an allegation is a passing mention that the charges were "brought falsely against him." (Doc. No. 4, ¶ 40.) Instead, Plaintiff makes these claims only in his response to the Motion to Dismiss. (*See, e.g.,* Doc. No. 21, at 9 ("Officer Atchley and Officer Allred filed false police reports and submitted an affidavit containing false information"); *id.* at 9–10 ("Plaintiff alleges in his Complaint that the charges against him were unreasonable and false, effectively asserting that the facts contained in the police reports were similarly false.").) The Court may not consider these statements as allegations. *See Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir.1984) ("it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss"); *accord Powell v. Dallas Morning News LP,* 610 F.Supp.2d 569, 577 (N.D.Tex.2009). Without any additional grounding in the specific allegations of the Amended Complaint, the Court cannot draw the broad inferences Plaintiff

proposes.[9] Accordingly, Defendants' Motion to Dismiss is granted without prejudice with respect to this claim.

In the alternative, Plaintiff has requested leave to amend his complaint to include additional factual allegations with respect to this claim. The Court finds it appropriate to grant that motion to amend. *See* Fed.R.Civ.P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

## B. Retaliation

Second, Plaintiff alleged that his right to equal protection of the law was violated because Defendants retaliated against him for exercising his Second Amendment right to keep and bear arms. However, Plaintiff now acknowledges that he has not stated a claim on this basis. (Doc. No. 34, at 20–21.) Accordingly, Defendants' Motion to Dismiss is granted with respect to this claim.

## C. Denial of Medical Care

■■■■ Third, Plaintiff argues that he was improperly denied medical care while in jail, in violation of his right to due process. The Due Process Clause protects pre-trial detainees, including those who have "been arrested, processed by the police department, and spent several hours in jail" at the time the alleged misconduct occurs. *Gutierrez v. City of San Antonio,* 139 F.3d 441, 452 (5th Cir.1998) (citing *Brothers v. Klevenhagen,* 28 F.3d 452, 455–56 (5th Cir.1994)). To state a claim for denial of medical care, a plaintiff must allege "that a state official acted with deliberate indifference to a substantial risk of serious medical harm and that injuries resulted." *Wagner v. Bay City,* 227 F.3d 316, 324 (5th Cir.2000). "Deliberate indif-

ference is an extremely high standard to meet," and a "plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino v. Texas Dep't of Criminal Justice,* 239 F.3d 752, 756 (5th Cir.2001) (quoting *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir.1985)).

■■■ "[I]n order to maintain a viable claim for delayed medical treatment there must have been deliberate indifference, which results in harm." *Mendoza v. Lynaugh,* 989 F.2d 191, 193 (5th Cir.1993). Under the deliberate indifference standard, "'[a] prison official cannot be found liable under the Eighth Amendment ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Easter v. Powell,* 467 F.3d 459, 463 (5th Cir.2006) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). "However, a prison official's knowledge of a substantial risk of harm may be inferred if the risk was obvious." *Id.* (citing *Farmer,* 511 U.S. at 842–43, 114 S.Ct. 1970).

Plaintiff alleges that he was injured by the officers and lost consciousness before being taken to jail. He alleges that he was offered no immediate medical attention, that he only saw a nurse two days after sustaining the injuries, and that the nurse was unable to provide any medication or

---

9. Plaintiff also asks the Court to refer to the police report and Officer Atchley's affidavit, which are attached as exhibits to Plaintiff's brief, as "matters of public record" in deciding the Motion to Dismiss. However, those documents do not by themselves create a claim when the Amended Complaint is devoid of any allegation that those documents contain fabricated information or that the officers intentionally made false statements.

treatment for his injuries. In his brief, Plaintiff argues that it can be inferred from the pleadings and the record that the officers were aware that Plaintiff had sustained serious injuries but that they displayed deliberate indifference to Plaintiff's need for medical attention. He also argues that it can be inferred that the officers denied Plaintiff medical care for the purpose of punishment.

The Court finds that Plaintiff has sufficiently alleged a due process violation through denial of medical care. He alleges that Officers Atchley and Allred injured him during the course of his arrest to the point that he became unconscious and bloody, and that he did not regain consciousness until he was in jail. Thus, assuming the allegations to be true, the officers knew that Plaintiff was unconscious, yet did not ensure that he received medical care when he arrived at the jail. This meets the standard of deliberate indifference: the substantial risk of harm from denying medical attention to a person who has been knocked unconscious from being thrown on the sidewalk and kicked in the head, back, and shoulders would be obvious to any reasonable person, and it can be inferred that the officers knew of that substantial risk. *See Easter*, 467 F.3d at 463 (citing *Farmer*, 511 U.S. at 842–43, 114 S.Ct. 1970). Plaintiff has also alleged that injuries resulted, as he suffered from additional pain because his injuries were not treated. *See, e.g., Easter*, 467 F.3d at 464–65 (finding "substantial harm" prong met based on severe chest pain suffered during period of time in which official refused to treat inmate).

The Court also finds that qualified immunity does not bar the medical care claim at this stage of the case. At the time of the events at issue, it was "clearly established that officials will only be liable for episodic acts or omissions resulting in the violation of a detainee's clearly established constitutional rights if they 'had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.'" *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388, 393–94 (5th Cir.2000) (quoting *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir.1996)). Accordingly, the officers were "on notice" that denying Plaintiff medical care violated his due process rights. *See Murray v. Earle*, 405 F.3d 278, 289 (5th Cir.2005) ("a plaintiff must establish that the right an official is alleged to have violated was 'clearly established,' i.e., sufficiently clearly defined that 'a reasonable official would understand that what he is doing violates that right.'") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). Plaintiff has alleged facts that would support the conclusion that the officers' conduct "was objectively unreasonable when applied against the deliberate indifference standard." *Jacobs*, 228 F.3d at 394.

Accordingly, Defendants' Motion to Dismiss is denied with respect to the claim for denial of medical care.

## VI. MUNICIPAL LIABILITY

Plaintiff alleges that the City of Galveston is liable for the constitutional violations because 1) there was an unconstitutional policy, custom, or practice conduct by the city; and 2) the city failed to adequately and properly hire, train, supervise, discipline, and control its police officers, including Officers Atchley and Allred.

### A. Legal Standard

Municipalities are considered "persons" who may be sued directly under Section 1983. *Monell v. Dep't of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, "a municipality cannot be held vicariously liable for the constitutional torts of its employees

or agents." *Gros v. City of Grand Prairie,* 181 F.3d 613, 615 (5th Cir.1999) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). "A municipality is liable only for acts directly attributable to it through some official action or imprimatur." *Valle v. City of Houston,* 613 F.3d 536, 541 (5th Cir.2010) (citation omitted). To establish municipal liability under Section 1983, a plaintiff must prove three elements: "1) a policymaker; 2) an official policy; and 3) a violation of constitutional rights whose moving force is the policy or custom." *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir.2001). A local government may be sued under Section 1983 " 'if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulations, or decision officially adopted and promulgated by that body's officers.' " *Zarnow v. City of Wichita Falls,* 614 F.3d 161, 166 (5th Cir.2010) (quoting *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion)). "Alternatively, official policy is a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Brown v. Bryan County,* 219 F.3d 450, 457 (5th Cir. 2000) (citation omitted).

The failure to train municipal employees may also constitute a "policy," but only when it "reflects a 'deliberate' or 'conscious' choice by a municipality." *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Thus, although municipalities are not normally liable for inadequate training of employees, failure to properly train constitutes an actionable "policy" if, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to

result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390, 109 S.Ct. 1197. To state a claim for municipal liability for failure to train or supervise, a plaintiff must allege 1) that the highly predictable consequence of not training or supervising the officer was that the officer would violate the Constitution; and 2) that this failure to train or provide supervision was the moving force that had a specific causal connection to the constitutional injury. *Brown,* 219 F.3d at 461. "Claims of inadequate training generally require that the plaintiff demonstrate a pattern of conduct." *Sanders–Burns v. City Of Plano,* 594 F.3d 366, 382 (5th Cir.2010).

Finally, to hold the city liable on the basis that a policymaker improperly hired the officer, Plaintiff must allege deliberate indifference, which in this context means that the constitutional violation was a "plainly obvious consequence" of the hiring decision. *Brown v. Bryan County,* 219 F.3d at 461 (citing *Bryan County v. Brown,* 520 U.S. 397, 411, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

### B. Pleading Standard for Municipal Liability

In *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the Supreme Court rejected the Fifth Circuit's application of a heightened pleading standard to Section 1983 claims against municipalities, reaffirming that "all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 168, 113 S.Ct. 1160 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). However, *Leatherman* pre-dates *Twombly* and *Iqbal,*

and courts have split as to the appropriate pleading requirements for municipal liability following those cases. Some courts have allowed generic or boilerplate assertions of the grounds for holding the municipality liable. *See, e.g., Charles v. Galliano,* 2010 WL 3430519, at \*6 (E.D.La. Aug. 26, 2010) ("Boilerplate allegations of inadequate municipal policies or customs are generally sufficient."); *Dwyer v. City of Corinth,* 2009 WL 3856989, at \*9 (E.D.Tex. Nov. 17, 2009) (same); *Abdulkhalik v. City of San Diego,* 2009 WL 4282004, at \*10 (S.D.Cal. Nov. 25, 2009) ("A plaintiff has alleged sufficient facts to assert a *Monell* claim even if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice.' ") (citation omitted); *Gearin v. Rabbett,* 2011 WL 317728, at \*9 (D.Minn. Jan. 28, 2011) ("In this Court's view, Gearin's allegations fall far short of the pleading standards of [*Twombly* and *Iqbal*]. But … *Leatherman* rejected any heightened pleading requirement for *Monell* claims, and it was apparently sufficient for the *Leatherman* plaintiff merely to allege inadequate training—without specifying what was inadequate about the training or who was responsible for those inadequacies.").

Other courts have treated *Twombly* and *Iqbal* as dramatically altering the pleading requirements for municipal liability claims. *See, e.g., Wright v. City of Dallas,* 2010 WL 3290995, at \*2–4 (N.D.Tex. July 19, 2010) (applying *Iqbal* to dismiss claim against city due to insufficient factual support); *Hutchison v. Metropolitan Government of Nashville and Davidson, County,* 685 F.Supp.2d 747, 752 (M.D.Tenn.2010) ("Although Plaintiff's Amended Complaint cannot survive the Motion to Dismiss after

*Iqbal,* the Court must note that it is uncomfortable with this pleading standard as now applied, especially in the context of Section 1983 and municipal liability."); *Young v. City of Visalia,* 687 F.Supp.2d 1141, 1149 (E.D.Cal.2009) ("In light of *Iqbal,* it would seem that the prior Ninth Circuit pleading standard for *Monell* claims (i.e. 'bare allegations') is no longer viable."); *Smith v. District of Columbia,* 674 F.Supp.2d 209, 213 n. 2 (D.D.C.2009) ("To be sure, the D.C. Circuit previously held that a plaintiff need only plead that a municipality ' "knew or should have known" about the ongoing constitutional violations' to sustain a claim for *Monell* liability predicated on deliberate indifference. But *Warren* [*v. District of Columbia,* 353 F.3d 36 (D.C.Cir.2004) ] preceded *Iqbal,* and must now be interpreted in light of that subsequent Supreme Court decision. Under *Iqbal,* such conclusory pleadings are no longer sufficient to state a claim on which relief may be granted.").

The Court believes that *Leatherman* and *Iqbal* may be reconciled, without allowing boilerplate allegations, on the one hand, or requiring plaintiffs to plead specific factual details to which they do not have access before discovery, on the other. *Iqbal* instructed that "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 129 S.Ct. at 1950. In the context of municipal liability, as opposed to individual officer liability, it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery.[10] Accordingly, only minimal

---

**10.** *See, e.g., Williams v. City of New York,* 690 F.Supp.2d 338, 344 (S.D.N.Y.2010) (noting

Second Circuit's "less stringent pleading standard for failure to train claims because 'it is

factual allegations should be required at the motion to dismiss stage. Moreover, those allegations need not specifically state what the policy is, as the plaintiff will generally not have access to it, but may be more general. *See Hobart v. City of Stafford,* 2010 WL 3894112, at *5 (S.D.Tex. Sept. 29, 2010) (*Hobart I*) (Ellison, J.) ("even general facts which point to prior violations by [the police department] would allow the [plaintiffs] to survive the motion to dismiss phase"). Unlike the context presented in *Iqbal,* where high-ranking government officials were sued in their individual capacities, the concerns of protecting public servants from the "concerns of litigation, including avoidance of disruptive discovery," *Iqbal,* 129 S.Ct. at 1953, are not present in suits against municipalities. *See Leatherman,* 507 U.S. at 166, 113 S.Ct. 1160 ("unlike various government officials, municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983"); *Owen v. City of Independence,* 445 U.S. 622, 635–657, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (discussing lack of historical, statutory, or policy basis for municipal, as opposed to individual, qualified immunity). Moreover, municipal liability claims do not occur in a vacuum, but rather arise in the context of a plaintiff's specific allegations of misconduct by individual officials to which he was personally subjected.

Still, a plaintiff suing a municipality must provide fair notice to the defendant, and this requires more than genetically restating the elements of municipal liability. Allegations that provide such notice could include, but are not limited to, past incidents of misconduct to others,[11] multiple harms that occurred to the plaintiff himself,[12] misconduct that occurred in the

unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage.' ") (citing *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 129 n. 10 (2d Cir.2004)); *Mitchell v. Township of Pemberton,* 2010 WL 2540466, at *6 (D.N.J. June 17, 2010) ("[I]nformation concerning a town's customs or policies, the policymakers' motivations behind such policies, or the facts surrounding police department customs, are typically unavailable to an outsider, so that pleading facts to sufficiently advance a racial profiling claim may be impossible without some assistance through litigation tools such as request for admissions, interrogatories, document requests, and depositions."); *Wilson v. City of Chicago,* 2009 WL 3242300, at *3 (N.D.Ill. Oct. 7, 2009) ("It is not reasonable to expect a plaintiff to have information about other incidents at the pleading stage; instead, a plaintiff should be given the opportunity to develop an evidentiary record to determine whether he can provide support for his claims."); *Kelly v. Spokane Airport Bd.,* 2011 WL 204867, at *4 (E.D.Wash. Jan. 20, 2011) ("Plaintiff has plausibly alleged facts which suggest but do not prove that the Defendants may have legal liability herein. However, without basic discovery, Plaintiff

cannot reasonably be expected to go further at this time. Plaintiff is not required at this stage in the litigation to state with any *extra* specificity the nature and extent of this de facto policy by Defendant.") (emphasis in original); *see also Schultea v. Wood,* 47 F.3d 1427, 1432 (5th Cir.1995) (en banc) (plaintiffs need not plead facts "peculiarly within the knowledge of defendants").

11. *See, e.g., Oporto v. City of El Paso,* 2010 WL 3503457, at *8 (W.D.Tex. Sept. 2, 2010) (refusing to dismiss a failure-to-train claim where plaintiffs alleged thirty-two prior incidents of officers using excessive deadly force); *Sagan v. Sumner County Board of Educ.,* 726 F.Supp.2d 868, 887 (M.D.Tenn.2010) (refusing to dismiss a failure-to-train claim where plaintiff alleged that abuse by teacher had occurred numerous times over the course of more than one academic year).

12. *See, e.g., Greenwood v. City of Yoakum,* 2008 WL 4615779, at *4 (S.D.Tex. Oct. 17, 2008) (refusing to dismiss a failure-to-train claim where plaintiff reported that he had been wrongfully mistreated by officers in the past); *Michael v. County of Nassau,* 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010) (refusing to dismiss failure-to-train claim in part

open,[13] the involvement of multiple officials in the misconduct,[14] or the specific topic of the challenged policy or training inadequacy.[15] Those types of details, or any other minimal elaboration a plaintiff can provide, help to "satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests," *Twombly*, 550 U.S. at 555 n.

3, 127 S.Ct. 1955, and also to "permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 129 S.Ct. at 1950.

This balance, requiring more than boilerplate allegations but not demanding specific facts that prove the existence of a policy, is in line with the approach of other courts post-*Iqbal*.[16] Where a plaintiff pro-

because plaintiff alleged he had faced multiple incidents of misconduct over a long, continuous time period).

13. *See, e.g., Michael,* 2010 WL 3237143, at *4 ("the fact that so much of this happened at headquarters, including in a public hallway, suggests that the officers involved did not fear supervisory personnel observing their conduct, intervening to stop them, or subjecting them to disciplinary action for their misdeeds").

14. *See, e.g., Matthews v. District of Columbia,* 730 F.Supp.2d 33, 38 (D.D.C.2010) ("number of officers involved," among other things, made failure to train claim plausible); *Michael,* 2010 WL 3237143, at *4 (same).

15. *See, e.g., Hobart v. City of Stafford,* 784 F.Supp.2d 732, 752, 2011 WL 1638606, at *13 (S.D.Tex. Apr. 29, 2011) (*Hobart II* ) (Ellison, J.) (refusing to dismiss custom-or-practice claim where plaintiffs "point[ed] to a specific type of training they allege that Stafford applies—the 'action/reaction motive'—and allege[d] specifically that officers are trained to use deadly force 'as a first resort' and 'before a person has a chance to act' "); *Robinson v. District of Columbia,* 736 F.Supp.2d 254, 265 (D.D.C.2010) (refusing to dismiss custom-or-practice claim where plaintiff "alleged a specific form of misconduct: intimidating and harassing motorcyclists by, *inter alia,* swerving into their lanes of traffic and causing them to fall or lose control of their vehicles"); *Evans v. City of Chicago,* 2010 WL 3075651, at *2 (N.D.Ill. Aug. 5, 2010) (refusing to dismiss custom-or-practice claim where plaintiff "define[s] what the practice is—to conduct warrantless searches and make arrests without probable cause when investigating the use of deadly force by Chicago police officers—and what that policy is meant to accomplish—to produce evidence, without regard to its reliability, that exoner-

ates the officer from allegations of wrongdoing in his use of deadly force."); *Robbins v. City of Miami Beach,* 2009 WL 3448192, at *2 (S.D.Fla. Oct. 26, 2009) (refusing to dismiss custom-or-practice claim where plaintiff alleged "that when incidents of excessive force are investigated, the investigation reports omit unfavorable evidence, exclude statements of non-police witnesses, and rely solely on the word of the police officers involved").

16. *See, e.g., Riley v. County of Cook,* 682 F.Supp.2d 856, 861 (N.D.Ill.2010) ("an official capacity claim can survive even with conclusory allegations that a policy or practice existed, so long as facts are pled that put the defendants on proper notice of the alleged wrongdoing"); *Lott v. Swift Transp. Co., Inc.,* 694 F.Supp.2d 923, 928 (W.D.Tenn.2010) ("Identifying the precise policy or custom may help make the complaint's allegations more plausible, but categorically viewing such a failure as dispositive in every case involving § 1983 claims risks imposing a higher standard of pleading than the Federal Rules of Civil Procedure mandate."); *Maldonado v. Racine County,* 2010 WL 1484235, at *4 (E.D.Wis. Apr. 12, 2010) ("At this stage, Maldonado need only sufficiently inform the defendants of the nature of her claim and persuade the court that the complaint states of plausible claim for relief. Whether or not Maldonado is able to muster evidence of the actual existence of such a policy or custom is a hurdle she will have to clear should the defendants move for summary judgment."); *see also Hobart I,* 2010 WL 3894112, at *5 ("the Court ... acknowledges that providing proof of a pattern of constitutional violations is exceedingly difficult for a plaintiff, who has no source of pre-discovery evidence that he may produce to support such a claim ... however, ... the [plaintiffs] must set forth at least *some* facts that allege a pattern of unconstitutional conduct by [the police department]") (emphasis in original).

vides more than a boilerplate recitation of the grounds for municipal liability, and instead makes some additional allegation to put the municipality on fair notice of the grounds for which it is being sued, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Leatherman,* 507 U.S. at 168–69, 113 S.Ct. 1160.

## C. Plaintiff's Allegations

First, Plaintiff alleges that there is "a pattern of brutality and excessive force in the Galveston Police Department." (Doc. No. 4, ¶ 81.) He alleges that the city "participated in and was aware of systemic violations of individual rights by Galveston police officers," including "the habitual use of excessive force, unlawful searches and seizures, groundless and unlawful arrests and reports, intimidation, cruel and unusual punishment and denials of due process and equal protection." (*Id.* at ¶ 82.) He alleges that the city "ha[s] a policy or custom of failing to properly investigate, reprimand, discipline, and punish officers" for misconduct, and that the policy "encouraged, condoned, and permitted" the officers' violation of Plaintiff's rights. (*Id.* at ¶ 83.) He also alleges that the city had actual or constructive knowledge of the pattern of misconduct, and that the policy directly and proximately caused Plaintiff's injuries. (*Id.* at ¶¶ 84, 86.)

Second, Plaintiff alleges that the city failed to train officers with respect to "constitutionally appropriate use of force," "employing safe and constitutionally permissible means of performing necessary police functions when dealing with citizens," and "the laws of the State of Texas and the rights guaranteed to citizens under the United States Constitution." (Doc. No. 4, ¶¶ 89–90.) He alleges that this failure to train amounted to deliberate in-

difference and that it directly resulted in his injuries. (*Id.* at ¶¶ 91–92.)

Third, Plaintiff alleges that the city "failed to adequately screen and hire law enforcement officers, including Officers Atchley and Allred," and that, "[a]s a result, the Galveston Police Department included members who, by temperament or prior experience, were inclined to use abusive and excessive force and were highly likely to inflict the injury suffered by Plaintiff." (Doc. No. 4, ¶ 94.) He also alleges that the improper hiring "resulted in a pattern of unconstitutional application of the use of force and directly resulted in the deprivation of Plaintiff's rights and constituted a deliberate, malicious, and reckless indifference to the rights and safety of Plaintiff." (*Id.,* at ¶ 95.)

## D. Analysis

The Court finds that Plaintiff has provided only generic, boilerplate recitations of the elements of claims against a municipality for an unconstitutional custom or practice, failure to adequately train or supervise, and negligent hiring of officials. Although Plaintiff's allegations are fairly lengthy, they consist only of a list of number of broadly-defined constitutional violations (for example, "excessive force" and "unlawful searches and seizures") followed by the assertion that there was a pattern of such violations, that there was a failure to train, or that the violations resulted from improper hiring. This does not provide the city with fair notice of the grounds for which it is being sued, or allow the Court to plausibly infer actionable misconduct by the city. As discussed above, Plaintiff must provide at least minimal factual allegations regarding the city's liability that go beyond generic restatements of the elements of such a claim. Because he has not done so, Defendants' Motion to Dismiss is granted without prejudice with respect to this claim.

However, Plaintiff has requested leave to amend his complaint to provide additional allegations against the city. He details a number of specific allegations that he will include in an amended pleading, which suggest that he will be able sufficiently to allege municipal liability. (*See* Doc. No. 34, at 27–28.) Accordingly, the Court grants leave to amend the complaint with respect to the claims against the city.

## VII. CONCLUSION

For the reasons described in this order, Defendants' Motion to Dismiss (Doc. No. 6) is **GRANTED IN PART AND DENIED IN PART.** The Court will allow Plaintiff leave to amend his complaint to attempt to cure the deficiencies identified in this order.

**IT IS SO ORDERED.**